**In re REA EXPRESS, INC., PRIVATE TREBLE DAMAGE ANTITRUST LITIGATION.***

**M.D.L. No. 115.**

United States District Court,
E. D. Pennsylvania.

Feb. 18, 1976.

* For consolidated cases see Appendix.

Franklin Poul, Judith R. Cohn, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiffs.

Edwin Zimmerman, Gerald P. Norton, James R. Atwood, Liaison Counsel, Covington & Burling, Washington, D. C., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, Judge.

### I. Preliminary Statement

#### A. The Parties

This antitrust case is now before us on defendants' motion for summary judgment. Plaintiff REA Express, Inc. ("REA") was incorporated in 1928 by the nation's railroads to provide an expedited transport service for small packages to the public.[1] Approximately eighty-six railroads held all of REA's stock from the time of its formation until 1968. The shareholding railroads, together with some 300 short lines,[2] contracted with REA during this period to provide transport services to it. In 1969 nearly all the railroad-shareholders divested themselves of their REA stock and their control over the corporation[3] (hereinafter "divestiture").

In 1928, at the time of the formation of REA, the railroads applied to the Interstate Commerce Commission ("ICC") for approval of their joint control of REA and of a pooling arrangement, under which: (1) express shipments would be carried by the railroads for REA under uniform operating contracts; and (2) REA's gross express revenues would first be used to pay the agency's out-of-pocket costs, and all remaining revenues would be paid to the roads in proportion to their express carriage as "rail transportation revenues," leaving REA with no net revenues of its own.[4] The ICC approved the control and pooling arrangements in 1929, and for the next forty years,

1. REA Express [Canada], Ltd. is also a plaintiff, but the positions of both plaintiffs on the issues before us are identical; hence, reference will be made only to plaintiff and to "REA." REA Express, Inc. has recently been adjudicated bankrupt. The bankruptcy proceedings are presently pending before Bankruptcy Judge John Galgay in the United States District Court for the Southern District of New York. The pendency of those proceedings has, however, no effect on the matter before us.

2. Allocation of REA shares of stock among the railroads was on the basis of each road's previous share of express carriage. The reason given for not including the short line railroads as shareholders was that under the proposed method of allocation their shareholdings would

have been "so small a fraction of a share for each company" and of no practical significance. 150 I.C.C. 423, 426–27, 430 (1929).

3. Over 99% of REA stock is now owned by the REA Holding Corporation whose controlling principals are members of the management team which ran REA during the transition period. However, two railroads still own REA stock, apparently because they simply forgot to sell it during the divestiture period, although those railroads are nonetheless defendants in this action.

4. The control approval was pursuant to § 5(2) of the Act, 49 U.S.C. § 5(2) (1970). The pooling arrangement was approved under § 5(1), 49 U.S.C. § 5(1) (1970).

REA was operated as a wholly owned joint facility of the participating railroads.

REA originally filed this action against 160 railroads comprising the major railroad-shareholders of REA, and a number of railroads which were parties to the uniform contracts but never REA shareholders. A number of former railroad shareholders of REA were not named as defendants. Some of those are roads which broke rank and agreed to certain individual dealings with REA after divestiture. After the complaint was filed, REA voluntarily dismissed without prejudice certain of the defendants from the action. Thirty-seven defendants filed motions alleging that venue in this District was improper (and some also attacked the validity of service of process). We held a conference with the parties, following which counsel for REA and counsel for the defendants reached an agreement resolving the pending motions. As a result of this agreement, the action was dismissed against nine defendants, ten defendants withdrew their venue motions, and the actions against thirteen defendants were transferred to other districts.

REA thereupon moved before the Judicial Panel on Multidistrict Litigation (JPML) under 28 U.S.C. § 1407 (1970) for the pretrial consolidation of the transferred actions in this Court. In addition REA requested that actions brought against it elsewhere by two of the defendants be consolidated with the actions here for pretrial proceedings: *Seaboard Coast Line R. R. v. REA Express, Inc.* (M.D.Fla., No. 70–937); *St. Louis-Southwestern Ry. Lines v. REA Express, Inc.* (N.D.Cal., No. C–71–2030 ACW). On December 21, 1972, the JPML transferred all of the actions to this Court under the above Jud.Pan.Mult.Lit. Docket Number. *In Re REA Express, Inc.,* 352 F.Supp. 803 (Jud.Pan.Mult.Lit.1972).[5] A third action, *Chicago, Milwaukee, St. Paul & Pacific R. R. v. REA Express, Inc.,* (N.D. Ill., No. 74C–1093) was later transferred here.[6] (For purposes of this opinion, we will refer to the Chicago, Milwaukee, St. Paul & Pacific R. R. as a party defendant.) REA has recently dismissed against a few other now defunct railroads.[7]

### B. *Summary of Plaintiff's Claims*

In its complaint, REA alleges that from the time it began operations in 1929 it was the victim of an antitrust conspiracy that violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970).[8] The alleged

---

**5.** Although a number of cases are before us only by JPML pretrial proceedings reference, we are satisfied that such reference encompasses action on a summary judgment motion. *See Humphreys v. Tann,* 487 F.2d 666 (6th Cir. 1973); *Reidinger v. Trans World Airlines, Inc.,* 463 F.2d 1017, 1018 n. 2 (6th Cir. 1972). The House Report on the bill which added § 1407 to Title 28 stated:

> By the term "pretrial proceedings" the committee [House Committee on the Judiciary] has reference to the practice and procedure which precede the trial of an action. These . . . are governed by the Federal Rules of Civil Procedure . . . Under the Federal rules the transferee district court would have authority to render summary judgment . . . . H.R.Rep.No.1130, 90th Cong., 2d Sess. (1968); 2 U.S.Code Cong. & Admin.News, pp. 1898, 1900 (1968).

The Judicial Panel also contemplates that a transferee judge may finally dispose of transferred cases on a summary judgment motion. *See* Jud.Pan.Mult.Lit.R. 11(a).

**6.** The Florida, California, and Illinois actions were brought by the railroads seeking balances for transportation allegedly purchased by REA.

REA interposed an antitrust counterclaim raising issues identical to those before us here. Count I of each counterclaim is identical to Count I of the complaint, and Count II of the counterclaim is identical to Count II of the complaint.

**7.** Most of the remaining railroads are represented by Edwin M. Zimmerman, Esquire, of the Washington, D.C. firm of Covington & Burling. While some of the roads have other counsel, Mr. Zimmerman has acted as lead counsel in the case, and, in that capacity, has filed motion papers which we deem to have been filed on behalf of all of the railroads.

**8.** In its § 2 claim, plaintiff alleged that the defendants controlled upwards of 90 percent of the rail transportation in the United States and that their collective control of the only major express carrier and use of that control to further their own interests constituted a misuse and expansion of defendants' monopoly into the express business. Thus, under § 2 of the Sherman Act, the railroads' acquisition of REA is attacked, and the basic thrust of the complaint for the pre-divestiture years is repeated:

conspirators are the defendant railroads, a number of whom owned all the stock of REA until August 1969, the others being the short line railroads which were parties to the uniform contracts. While REA's discovery submissions have shown that in fact all former shareholders are not defendants, all such shareholders are among those claimed to have been co-conspirators.

Plaintiff claimed the alleged conspiracy had three objectives. First, plaintiff alleges that, prior to divestiture, the defendants conspired to avoid competition among themselves and other railroads in furnishing transportation services to REA, by conferring with each other, both individually and through railroad rate bureaus, about prices to be charged REA for rail transportation services, and by dictating contract terms which were disadvantageous to the plaintiff. *Inter alia*, REA attacks a 1967 resolution of its railroad controlled Board of Directors, whereby the railroads supposedly established minimum charges to be imposed upon REA for TOFC (trailor-on-flat-car or "piggyback") service, and which also limited REA's right to divert traffic from one railroad to another. Furthermore, after the railroads' sale of REA in 1969, the defendants allegedly continued their practice of avoiding competition with respect to REA by employing regional rate bureaus to establish uniform transportation contracts with REA. Plaintiff claims also that in late 1970 the defendants and other railroads attempted to impose increased charges upon REA for rail services and that, despite requests from the plaintiff, refused to negotiate individually concerning charges and terms for transportation services.

The second alleged purpose of the conspiracy was to impose excessive and onerous charges and other conditions on REA's use of the defendants' properties and facilities. The complaint charges that the defendants established uniform rates, terms and conditions which REA was obliged to accept in lease agreements for terminal space, and that in 1968, prior to the sale of REA to non-railroad interests, these terms were incorporated in Uniform Carrier's Agreements. REA claims that it has been unable to negotiate rentals at rates different from those uniformly applied and that in instances its efforts to terminate the standard leases have been ignored.

Third, REA claims that the conspiracy had the purpose and effect of preventing it from engaging in activities competitive with those of the railroads and from employing non-rail modes of transportation. As to this allegation, REA has asserted only pre-divestiture actions by the railroads. Plaintiff claims that between 1929 and 1959 REA was permitted to provide over-the-road truck service only with the consent of the affected railroads and that a May 1929 resolution by the REA board limited its management in negotiating contract terms with motor carriers. REA also claims that the railroads forced it to use motor carrier subsidiaries of the railroads and, prior to 1969, continually protested to the REA management concerning proposed applications for truck routes. In 1968 the railroads allegedly caused REA to seek ICC approval of an inefficient nationwide motor route system, and prevented REA from making appropriate applications to regulatory agencies in order to acquire appropriate routes. Additionally, it is claimed that defendants sought to limit REA's ability to provide air express service in competition with the railroads. The defendants and other railroads are alleged to have agreed with certain airlines that REA's contracts with the airlines would require excessive and non-competitive air express rates, and in 1948 allegedly directed REA's management, through its railroad controlled board, to ignore a CAB proposal for revision of the Air Express Agreement which would have proven favorable to REA.

the railroad owners of REA dealt with it for their own benefit. Plaintiff has not mentioned, much less supported, its § 2 claim in its briefs in opposition to defendants' motion for summary judgment. Hence, we find that plaintiff has abandoned its § 2 claim. Even if plaintiff had not abandoned this claim, we would have found it to be barred by the same principles that prevent recovery by plaintiff on its § 1 claim. *See* discussion *infra*.

As a further part of its antitrust claim, REA alleges that the defendants caused its Board of Directors to authorize it to make an unsound investment in certain refrigerated rail cars in 1955. It is claimed that the railroads intended the purchases both to burden REA with a financial obligation which would hinder its ability to compete with the railroads and to bind REA to the use of the rail mode. The refrigerator cars allegedly were obsolete at the time of their purchase and had been unprofitable for many years. The same refrigerator car claims are realleged in Count II as a pendent claim that the railroads induced the REA board to breach its fiduciary duties owed to the plaintiff.[9]

### C. The Grounds of Defendants' Motion for Summary Judgment

Defendants' motion for summary judgment is bottomed upon a number of distinct grounds, some of which apply to plaintiff's pre-divestiture claims, and others of which apply to its post-divestiture claims.

The first basis of defendants' attack on the pre-divestiture claims is that REA may not make a claim based upon the conduct of all its former shareholders or upon conduct which preceded the REA Holding Corporation's ownership. (The Holding Corporation was the vehicle for divestiture.) The attack is essentially upon plaintiff's standing. This defense proceeds from the doctrine announced by Dean Pound in the famous case of *Home Fire Insurance Co. v. Barber*, 67 Neb. 644, 93 N.W. 1024 (1903), that it would be inequitable to permit new stockholders to obtain a windfall recovery of a large part of their purchase price by bringing suit in the corporate name against prior management for its alleged misappropriations notwithstanding that the stock was worth all they paid for it and that they obtained all they bargained for. After the filing of defendants' motion the Supreme Court decided the case of *Bangor Punta*

*Operations, Inc. v. Bangor & Aroostook R. R.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), which adopted and applied the *Home Fire* principles in an antitrust context extremely similar to the case at bar.

In addition to the equitable doctrine, although closely related thereto, defendants seek dismissal of plaintiff's claims on the ground that the complaint fails to state a claim under the antitrust laws for the period in which REA was wholly owned by the railroads, asserting that antitrust decisions and enforcement policy recognize that a wholly owned subsidiary has no right to economic independence from its parents. Defendants also assert that all antitrust claims that accrued prior to April 3, 1967, are barred by the statute of limitations contained in § 4B of the Clayton Act, 15 U.S.C. § 15b (1970).

Finally, defendants contend that regulatory considerations bar prosecution of REA's claims. More specifically, they rely upon the immunity provisions of § 5(11) of the Interstate Commerce Act, 49 U.S.C. § 5(11) (1970), which accord immunity from the antitrust laws in connection with the control and pooling activities approved by the ICC under §§ 5(1) and 5(2) of that Act. Defendants assert that ICC approval under §§ 5(1) and 5(2) of what they consider to be the fundamental relationships between themselves and their express company subsidiary requires dismissal of plaintiff's pre-divestiture claims. Relying heavily upon the recent decision of the Supreme Court in *Hughes Tool Co. v. Trans World Airlines Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (hereinafter *"Toolco"*) to bolster their immunity claims, the defendants' argument, with material aid from *Toolco*, also elides into the claim that the ICC, by virtue of its pervasive regulatory power over the substance of the railroad-wholly owned express company relationship, pre-empted the field and removed it from antitrust scrutiny.[10]

---

**9.** Defendants moved early in the proceedings to dismiss the pendent claim. We denied the motion without prejudice to their reasserting it in the wake of additional discovery.

**10.** The railroads also claim that Count II (the pendent count asserting a claim for breach of fiduciary duty with respect to the purchase of the refrigerator cars) is barred by reason of

Defendants' attack upon plaintiff's post-divestiture claims is totally related to regulatory considerations. Their first contention is that plaintiff's claim based upon the alleged collaborative setting of TOFC rates is barred by the doctrine of *Keogh v. Chicago & N. W. Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), because of the allegedly impermissible risk of collision between the antitrust laws and the ICC rate regulatory scheme which maintenance of the action would create. Should we reject their *Keogh* argument, defendants ask us to hold that their alleged collaborative action was immunized by § 5a of the Interstate Commerce Act, 49 U.S.C. § 5b (1970), or, alternatively, that a reference to the ICC is necessary for clarification of the immunity issue. The immunity argument flows from defendants' contention that the railroads involved in this case are parties to rate conference agreements which have been made pursuant to the provisions of § 5a and approved by the ICC under that section. Defendant's ICC reference or primary jurisdiction argument is that, to the extent there is a question about the efficacy of those rate conference agreements in the factual context before us (plaintiff contends that § 5a is wholly inapplicable), the matter should be referred to the ICC for clarification before we address it further.

Needless to say, the plaintiff has skillfully and forcefully countered each of defendants' contentions.

### D. *The Record on the Summary Judgment Motion*

The record before us on the summary judgment motion is massive. The parties spent over two years in developing that record in both formal and informal discovery. Numerous sets of interrogatories have been propounded and answered, and countless documents have been produced for inspection. The discovery was addressed solely to the merits of the liability issues. Because of the voluminous nature

*Home Fire* and *Bangor Punta*, the statute of limitations, and the common law doctrine of ratification.

of the documents and the logistical difficulties of locating records kept by some of the short line railroads (or even the major ones) in the 1930's and 1940's for instance, discovery was mainly confined to post-1959 matters.

The discovery has fully and fairly amplified the acts and transactions upon which the action and the attacks thereon are based. It includes a stipulation of basic facts. Attached to the motion and answer are comprehensive affidavits with relevant documentary exhibits.

The parties have explicated their respective positions with extensive briefs. We held a hearing on the motion lasting a full day.[11] The briefs are masterworks, and credit is due Mr. Poul and Ms. Cohn for the plaintiff and Messrs. Zimmerman, Norton and Atwood for the defendants for their efforts. Mr. Poul and Mr. Zimmerman are also to be commended upon their lucid and cogent oral arguments, which were each of surpassing quality, and rank with the finest we have ever heard.

### E. *Conclusion*

In the face of this vast record and the principle that summary judgment is granted sparingly in antitrust actions, *Poller v. Columbia Broadcasting Systems*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), one would think summary judgment an unlikely prospect in this case. However, despite the contentions of REA that defendants' theories are incorrect or inapposite to the facts, it is clear beyond peradventure that REA cannot recover on its claims based on pre-divestiture conduct. As to Count I this result follows not only from the application of the equitable principles of *Bangor Punta*, but also because, even taking the facts as plaintiff has advanced them, it has failed to state a claim under the antitrust laws, and because for the period of the railroads' control of REA, prosecution of plaintiff's antitrust claims is immunized, hence barred by § 5(11) of the Interstate Commerce Act.

11. The briefs, including various reply briefs, total some 300 pages. The transcript of the hearing consumes some 169 pages.

As to Count II, *Bangor Punta* is equally applicable, and the claim is also barred because of unanimous shareholder authorization and ratification.

The post-divestiture claims present more difficult problems. We have studied and restudied the record and the briefs with respect thereto, but because the point is so very close and because there are lacunae in the briefs and record which debar a decision at this time, we defer decision on those claims in order to allow further briefing and argument by the parties on the applicability of *Keogh, supra,* to this case, the scope of the § 5a exemption, and the complex primary jurisdiction issues raised by the defendants.

## II. *The History of REA and of its Relationship to the Railroads*

Understanding of the legal issues raised by the defendant's motion requires a somewhat detailed explication of the history of REA, focusing particularly on its relationship with the railroad defendants and the extent to which that relationship has been the subject of oversight by the ICC. The recitation which follows is composed of uncontested facts and forms the background for the legal discussion in Part III below.

### A. *The Formation of REA*

Prior to the formation of REA in 1929, the express business in the United States was conducted by companies (or, after 1918, one company) that were for the most part independent of the nation's railroads. These companies took orders from shippers and handled auxiliary pick-up and delivery service, though the actual movement of goods was performed by rail carriers under contractual arrangements between themselves and the express companies. Under these arrangements the shipper made full payment to the express company which in turn paid a fixed percentage of its gross revenues to the rail carrier.[12]

During World War I, while the railroads were under federal control, the Director General of Railroads recommended to the express companies the formation of a single corporation to act as his agent in conducting express business. The Director General's proposal led to the formation of the American Railway Express Company, which was a consolidation of the seven then operating express companies.[13]

After termination of federal control of the railroads, the ICC, pursuant to statutory authority,[14] approved the earlier consolidation of the express companies, enabling American Railway Express to carry on its consolidated operation.[15] American Railway Express continued to operate independently of the railroads for a period of about eight years, during which time the railroads encountered certain operational and regulatory problems in their relationship with it. These difficulties led to a decision by the railroads to form their own express company to purchase the assets of American Railway Express. REA was incorporated by agents of the railroads for this purpose in December 1928; shortly thereafter, REA and the prospective shareholding railroads (through appointed agents) submitted two applications to the ICC for approval.

The first application (Finance Docket No. 7322) sought approval under § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (1970), for the railroads to acquire 100% control of the new agency by acquisition of all its stock. The application and its exhibits explained that REA would be operated as a wholly-owned "joint facility of the

---

**12.** *See generally* Express Cases, 117 U.S. 1, 29 L.Ed. 791 (1886); Securities & Acquisition of Control of Railway Express Agency, Inc., 150 I.C.C. 423 (1929); In the Matter of Application for Consolidation of Express Companies, 59 I.C.C. 459 (1920) ("Application"); Express Contract, 1920, 59 I.C.C. 518 (1920); In the Matter of Express Companies, 1 I.C.C. 677 (1887).

**13.** *See* Application, *supra* note 12, at 460–61.

**14.** Transportation Act of 1920, ch. 91, § 407, 41 Stat. 480 (1920).

**15.** Application, *supra* note 12.

Participating Railroads"; would, after payment of expenses, "distribute all revenues received by it among its principals"; would have a 15-member board of directors including 14 representatives of the railroads; and would operate under uniform contracts (known as the "Standard Express Operations Agreement") with members of the railroad industry governing rentals, terms and conditions for conducting express business, the allocation of business among the railroads, and the availability to REA of non-rail modes of transportation.[16] The application also sought approval under § 20a(12) of the Act, 49 U.S.C. § 20a(12), for officers and directors of the railroads to hold all but one of the directorships of REA (REA's president regularly filled the last position) and for approval of REA's sale of its stock and certain debenture bonds.

In a second application (Finance Docket No. 7316), the railroads and REA sought approval under § 5(1) of the Act, 49 U.S.C. § 5(1) (1970), for the pooling aspects of the proposed uniform operating contracts under which express shipments would be carried by the railroads for REA. Under the pooling provisions, REA's gross express revenues would first be used to pay its out-of-pocket costs, and all remaining revenues would be paid to the roads in proportion to their express carriage as "rail transportation revenues." REA would thus be left with no net revenues. The application proposed that stock ownership in REA would be limited to the member roads of the American Railway Executives which traditionally carried nearly 98% of the nation's express traffic, but that all the nation's railroads, including over 300 short lines,

could become parties to the uniform contracts.[17]

After a joint hearing on the two applications, the ICC granted the requested relief in a single decision. *Securities & Acquisition of Control of Railway Express Agency, Inc.,* 150 I.C.C. 423 (1929). The Commission's report detailed the control arrangement and makeup of the REA board, commenting that the objective of the railroad proposal was "to provide for the future conduct of the express business through a separate agency, but in effect a joint facility of the railroads controlled by them through stock ownership." 150 I.C.C. at 426. The Commission found that the railroads' purchase of control of REA was in the public interest and also approved the pooling features of the proposed contract.

B. *The Standard Express Operations Agreement*

The Standard Express Operations Agreements (SEOA) entered into by the railroads and REA were intended to control the details of the REA-railroad relationships. Under the terms of the agreements, each railroad appointed REA as "its exclusive agent" to conduct express business over its lines. The SEOA set forth the terms and conditions governing the equipment and facilities to be furnished, arrangements for joint employees, and liability for damages and injuries. REA was prohibited by the agreements from using other means of transportation without the consent of the affected railroad. REA further agreed to divide competitive traffic between railroads on a fair and equitable basis based on pre-1929 express routing patterns. Most impor-

**16.** In the Matter of the Future Conduct of the Express Business, I.C.C., Finance Docket No. 7322 at 4; Report of the Legal Committee of the Railroad Uniform Express Contract Committee, at 11, 14, 56–87 (June 21, 1928).

**17.** Securities & Acquisition of Control of Railway Express Agency, Inc., 150 I.C.C. 423, 426–27, 430 (1929). Allocation of REA's shares of stock among the railroads was on the basis of each road's previous share of express carriage. 150 I.C.C. at 427. The reason given for not including the short-line railroads as sharehold-

er was that under the proposed method of allocation their stockholdings would have been "so small a fraction of a share for each company" and of no practical significance. 150 I.C.C. at 430.

The Southern Railway and its affiliated lines chose for a period to operate their own express agency, but in 1938 they joined the REA pooling agreement and became shareholders of plaintiff. Railway Express Agency, Inc., & Certain Railroad Carriers' Application for Authority to Contract for Pooling & Division of Earnings, 227 I.C.C. 517 (1938).

tantly, the SEOA laid out the method of distribution of express revenues. The arrangement called for the railroads to be divided into four groups: eastern, southern, western and mountain-Pacific. Each railroad was to receive 85% of the gross revenue accruing on its lines for carload shipments. The remaining 15% of the full carload revenues, the revenues collected by REA on less-than-carload shipments, and all other REA income within each group was designated as the "gross transportation revenue" for the group. Operating expenses and other deductible items were likewise ascertained separately for each regional group, and various items and charges (including interest) that were common to more than one group were apportioned among the groups. All of these items were then deducted from the group's revenues, and the remaining amount was designated "rail transportation revenue." The entire amount of "rail transportation revenue" was then paid out monthly to all the railroad signatories (not just the shareholders) on a basis reflecting the amount of express business done by each road.

Under the contract REA would have no operating profit. REA's out-of-pocket expenses were small compared to total express revenues, and the express agency had first claim on those revenues for payment of expenses; the railroads were to be compensated for transportation services after REA's other creditors were satisfied.

The SEOA's, by their terms, remained in effect until 1954. The terms of the original agreements were, however, reviewed again by the ICC in 1951, as a result of an antitrust action brought by the United States against REA, charging primarily that the SEOA provision making REA the exclusive agent of the contracting railroads for the conduct of express business constituted a restraint of trade and an attempt to monopolize the express business in violation of the

Sherman Act §§ 1 and 2.[18] REA thereupon applied to the ICC for a clarification of whether the 1929 order of the Commission was an approval of the exclusive agency provisions of the SEOA. The district court granted a stay of the judicial proceedings pending termination of the administrative proceeding.[19]

The ICC then supplemented its 1929 approval order in *Express Contract, 1929,* 275 I.C.C. 739 (1951). The Commission stated that the exclusive agency provisions were a "necessary and essential ingredient" of the pooling arrangement.[20] The court thereupon dismissed the antitrust suit, relying on the antitrust immunity provisions of the Interstate Commerce Act, 49 U.S.C. § 5(11). *United States v. Railway Express Agency, Inc.,* 101 F.Supp. 1008 (D.Del.1951).

### C. Express Operations: 1954–1959

The next time that the REA-railroad relationship was extensively reviewed by the ICC was in 1953, when the pooling, division of traffic, service and earnings provisions of a new SEOA (1954 SEOA) were submitted to the Commission, as required by § 5(1) of the Interstate Commerce Act. The ICC approved these provisions, which remained essentially unchanged from the earlier agreement. *Express Contract, 1954,* 291 I.C.C. 11 (1953). All of REA's shareholders executed the new agreement and ratified it at the subsequent REA annual shareholder meeting.

The 1954 SEOA contained a provision making REA responsible for supplying refrigerator cars required for the express business. REA's president recommended the purchase of 300 refrigerated express cars, and the Board of Directors adopted resolutions on May 25, 1954, September 28, 1954, and October 26, 1954, authorizing the purchase for a total cost of approximately $6,720,000. REA applied for and received ICC approval under § 20a of the Act, 49 U.S.C. § 20a (1970),[21] for the issuance of

---

**18.** *See United States v. Railway Express Agency, Inc.,* 89 F.Supp. 981 (D.Del.1950).

**19.** Id.

**20.** 275 I.C.C. at 745.

**21.** Section 20a requires a carrier to apply to the I.C.C. for approval of its issuance of bonds or other evidence of indebtedness. The Commission shall only approve the issue if it is for a purpose "compatible with the public interest."

long term installment promissory notes to finance the acquisition of the cars. The ICC approval order stated that the Commission found that (1) REA appeared to be in need of additional refrigerator cars; (2) issuance of said notes (a) is for a lawful object within REA's corporate purposes and compatible with the public interest, which is necessary and appropriate for and consistent with the proper performance by REA of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose. See *Railway Express Agency, Inc., Notes,* ICC Finance Docket No. 18774 (1955). The actions of the REA Board of Directors in connection with the acquisition and financing were subsequently approved unanimously by REA's shareholders.

During 1955, REA's president recommended two more purchases of refrigerator cars (totalling 700 cars at a cost of approximately $15,000,000), and the Board of Directors and shareholders of REA unanimously authorized the purchases. Each of these purchases was financed in the same manner as the first, such financings being approved by the ICC pursuant to §§ 20a and 214 of the Act, 49 U.S.C. §§ 20a, 314 (1970). See *Railway Express Agency, Inc., Notes,* ICC Finance Docket No. 18984 (1955); *Railway Express Agency, Inc., Notes,* ICC Finance Docket No. 19961 (1957).

The ICC next reviewed the REA-railroad relationship in 1959, when the railroads and REA proposed another new SEOA. Between 1954 and 1959, the railroads had become dissatisfied with the continuing deficits of REA and determined to place REA on a profit or loss basis in order to encourage greater efficiency and cost consciousness on REA's part. To further this goal, the new SEOA was drafted to modify the manner in which REA's gross revenues were distributed. Instead of all of REA's net revenues being distributed to the railroads as reimbursement for their services, REA would pay the railroads on a "car-foot mile" basis for other than carload transportation services, and retain one half of any excess after expenses as "profit." [22] The new agreement also gave REA greater routing freedom and the option of diverting traffic from rail to non-rail carriers.[23] It did not, however, alter in any way the railroad's ownership and control of REA. The ICC approved the pooling provisions of the new contract, *Express Contract, 1959,* 308 I.C.C. 545 (1959). All REA shareholders subsequently signed and ratified it.[24]

Section 5 of Article 2 of the 1959 SEOA was amended in 1967 as a result of the increasing use by REA of trailer on flat car (TOFC or "piggyback") service. The amendment reads as follows:

Where the maintenance of proper service standards for the transportation of express traffic makes it desirable to use trailer on flat car or container service for movement of express traffic, any Rail Company may contract with the Express Company to transport such express traffic under such terms as may be agreed, but without any undue preference or advantage or any undue prejudice or disadvantage, to the Express Company as compared with other users of comparable service performed by the Rail Company.

Shortly before the SEOA was amended, the board of REA adopted the following resolution:

RESOLVED, That, in administering 'Piggyback Amendment' to the Standard Express Operating Agreement (Article 2, Section 5), when and if it becomes effective, REA management shall not depart from the following policies without approval of the Board:

1. For Docket 28300 distances of 400 miles or more REA shall make arrange-

---

**22.** The other half went to the railroads as additional compensation for railroad services.

**23.** Any division could be protested by the rail carrier involved, and the dispute would then be resolved by the REA board.

**24.** One shareholder, the Chicago & North Western Railway Co., which decided not to sign, sold its shares back to REA on October 1, 1959, the effective date of the new SEOA.

ment for TOFC or COFC service at divisions no less than those the equivalent of the applicable lawful tariff rate on tariffs wherever such tariffs apply.

2. Before diverting any express traffic from one rail company to another the management shall (a) accord such rail company the opportunity to retain such traffic by instituting arrangements comparable to those under which the traffic would move if diverted, and (b) give consideration to the consequences of any diversion from passenger trains upon the ability of the rail company to continue the operation of such train where express traffic would in any event continue to be transported on that train.[25]

### D. *Divestiture of REA by the Railroads: 1959 to 1969*

In 1959, prior to the adoption of the 1959 SEOA, the REA board seriously considered two proposals to purchase REA but ultimately rejected them. In 1964, however, an offer from Greyhound Corporation to purchase about 20% of REA [26] was accepted by the REA board and approved by its shareholders. When the ICC approved the proposal over their objection, several western railroads challenged the approval in the United States District Court for the District of Colorado on June 16, 1965. A three judge district court upheld the ICC approval. *Denver & Rio Grande Western R. R. v. United States,* 255 F.Supp. 704 (D.Colo. 1966). On appeal, the Supreme Court reversed and remanded the case to the ICC for a determination of the anticompetitive impact of the sale. 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). After the Supreme Court decision, the sales agreement was terminated by the parties.

During 1967, the railroads sought and obtained other offers to purchase REA, but none of these offers was accepted. In connection with their effort to dispose of REA,

the railroads in 1968 took two steps. First, the 1959 SEOA was amended so as to terminate on December 31, 1968, rather than on December 31, 1973. Second, a voting trust was established to operate REA and to negotiate for the sale of the railroads' stock. On June 10, 1968, 52 railroads owning 96% of the common stock of REA entered into a 10 year voting trust arrangement giving three voting trustees full control of REA. The railroad directors simultaneously resigned from REA's board, and the trustees elected themselves and William J. Taylor, the president of REA, to serve on a four member board.

The voting trustees thereafter operated REA. On October 1, 1968, the trustees elected Spencer D. Moseley as the new president and chief executive officer of REA, effective December 16, 1968. In early 1969 a new management team recruited by Mr. Moseley assumed its duties with REA. On June 23, 1969, the voting trustees sent a communication to the voting trust participants, advising them that an REA management group had offered to purchase the company's stock. The offer was embodied in a memorandum dated June 20, 1969, signed by five of the executives of REA. The management group memorandum offered to form the REA Holding Corporation which would own at least 60% of the outstanding stock of that company. The executives would then cause the Holding Corporation to purchase all tendered stock of REA at a per-share price of $1 plus three tenths of a warrant. Each full warrant would give the railroad seller the right to purchase one share of the Holding Corporation at a specified time and for a specified price (ranging from $10 to $25) prior to July 31, 1974. The management group's offer was contingent upon acceptance by the owners of half the shares participating in the voting trust, which, under the terms of the voting trust agreement, would autho-

---

**25.** Plaintiff alleges that this resolution constitutes a horizontal price fixing agreement among the railroad suppliers to REA.

**26.** Greyhound was to purchase about 500,000 shares which were authorized for public sale as

part of a recapitalization of REA. As part of the sale, Greyhound also agreed to make a tender offer for additional shares which were owned by the railroads.

rize the trustees to accept on behalf of the owners of *all* the deposited REA stock. The voting trustees recommended acceptance of the offer.

By July 8, 1969, the expiration date of the offer, the voting trustees received the consent of more than 88% of the trusteed stock, and accordingly on July 29, 1969, a sales agreement was signed by Mr. Moseley, on behalf of the REA Holding Corporation, and the voting trustees, both individually and on behalf of the trust participants. Thereafter, in October 1969, all but four of the railroad shareholders transferred their REA stock to the Holding Corporation in accordance with the terms of the sale. Two other railroads—the Boston and Maine Railroad and the Gulf, Mobile and Ohio Railroad Company—sold their stock to the Holding Corporation in March and July 1970 respectively, and two railroads continue to hold small amounts of REA stock.[27]

In addition to the foregoing sales of REA stock by the railroad shareholders, a number of individual shareholders of REA transferred their shares to the Holding Corporation in 1969. The REA by-laws had been amended in anticipation of a public offering to allow persons other than railroads to hold REA stock. No such shareholders existed until July 22, 1968, when 60,000 shares were issued to each of the voting trustees in partial compensation for the services to be rendered to REA. Further, the voting trustees initiated an employee stock option plan, whereby 29 officers and employees of the express company were issued stock at various times during the first half of 1969. Additionally, McKinsey & Company, Inc., received 100,000

shares in January 1969 for its services as management consultant to REA and the voting trustees in 1968. All these non-railroad shareholders sold their stock to the Holding Corporation during 1969 on terms substantially the same as those offered to the railroad shareholders, except that Mr. Moseley retained a small number of shares until April 5, 1971, when he transferred his shares to the Holding Corporation.

None of the former railroad shareholders of REA has exercised its warrants to purchase stock of REA Holding Corporation; that corporation has no railroad stockholders.[28]

III. *Discussion  The  — —  Pre-Divestiture Claims*

   A. *The Impact of Railroad Ownership REA on Plaintiff's Claims*

   1. *Applicability  of  Bangor  Punta  to Counts I and II*

In connection with our decision upon the defendants' summary judgment motion, we have considered the plaintiff's damage claims in two segments: the period prior to the time of the transfer of the defendants' stock in plaintiff to REA Holding Corporation ("pre-divestiture period") and the period thereafter ("post-divestiture period"). We have done so because we find that different legal principles are applicable to each of these two periods. The discussion which follows relates to the pre-divestiture aspects of Count I (plaintiff's claim that defendants' control of plaintiff violated the antitrust laws) and to all of Count II (plaintiff's claim that the defendants induced the REA board to breach the fiduciary duty that it owed to plaintiff by approving sev-

---

**27.** The Chicago Great Western Railway owns 8,304 shares and the Florida East Coast Railway owns 12,456 shares. Together these holdings amount to 0.87% of the outstanding REA stock. Both roads were named as defendants in this action. The REA Holding Corporation is currently the only other shareholder, owning 2,395,508 shares, or 99.13% of the total.

**28.** In addition to the instances of I.C.C. review already noted, REA has had to seek I.C.C. approval of extension of its motor carrier operations. *See* Railway Express Agency, Inc., De-

termination of Status, 21 M.C.C. 161 (1939). REA filed approximately 1,700 applications for motor carrier authority with the I.C.C. *See, e. g.,* Railway Express Agency, Inc., Extension—Newport, Vt., 84 M.C.C. 435 (1961). In 1962, the Commission changed prior limitations on the ability of REA to extend its motor carrier operations but continued to require Commission approval before REA could initiate motor-carrier operations that were not auxiliary or supplemental to existing operations. *See* Railway Express Agency, Inc., Extension—Nashua, N.H., 91 M.C.C. 311 (1962).

eral purchases of refrigerator cars by plaintiff during the 1950's).

The defendants assert that they are entitled to summary judgment on plaintiff's pre-divestiture claims based, among other grounds, upon the recent Supreme Court decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. R.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) (*"Bangor Punta"*). Plaintiff claims that *Bangor Punta* is distinguishable from the case *sub judice* and additionally argues that, even if *Bangor Punta* does apply to the factual situation before us, it is not controlling as to the entire pre-divestiture period. We find, despite the factual distinctions pointed out by plaintiff, that *Bangor Punta* does control and that it is fatal to plaintiff's claims for the entire pre-divestiture period.[29]

In *Bangor Punta* the Court held that a corporation was barred from asserting claims under federal antitrust laws and other laws, including Maine common law, against the former owner of virtually all its stock, where that stock had recently been sold to one who had no interest in the company at the time of the alleged wrongdoings. The basic facts of *Bangor Punta* are quite similar to those here. In 1964 the defendant Bangor Punta Corporation acquired, through its subsidiary Bangor Punta Operations, Inc., 98.3% of the stock of the plaintiff Bangor & Aroostook Railroad ("BAR"). Five years later, Bangor Punta Operations sold its BAR shares to Amoskeag Company, which later acquired additional shares from outsiders to increase its ownership to more than 99% of the outstanding BAR stock. Then in 1971, BAR filed a 13-count complaint against Bangor Punta Corp., alleging violations of § 10 of the Clayton Act, 15 U.S.C. § 20 (1970), the federal securities laws, and Maine statutory and common law. The claims were based on acts of Bangor Punta Corp. during the period of its control of BAR. Damages of $7 million were claimed by BAR despite the

fact that Amoskeag had recently acquired its 98.3% interest in the plaintiff from Bangor Punta Operations for $5 million. The district court granted summary judgment for the defendants and dismissed the complaint, *Bangor & A. R. Co. v. Bangor Punta Operations, Inc.,* 353 F.Supp. 724 (D.Me. 1972), reasoning that the real party in interest in the suit, Amoskeag, suffered no injury because it owned no stock at the time of the alleged wrongful acts and that any recovery on its behalf would have constituted a windfall. The district court grounded its decision on the equitable principles described in *Home Fire Insurance Co. v. Barber,* 67 Neb. 644, 93 N.W. 1024 (1903) (Pound, J.). In that case, Dean Pound stated the principle that where shareholders acquire their stock after the alleged wrongdoing, they have no standing to bring suit claiming damages based on that alleged wrongdoing. The First Circuit, in reversing the District Court in *Bangor Punta,* did not question the *Home Fire* equitable principle, but rather found that the doctrine should not prevent the enforcement of the federal antitrust and securities laws in a situation where the plaintiff was a common carrier that could pass the benefit of its recovery on to the public. The Supreme Court reversed the Court of Appeals, adopting the *Home Fire* rationale. The Court stated that a shareholder may not assert claims on behalf of his corporation "if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions." 417 U.S. at 710; 94 S.Ct. at 2583, 41 L.Ed.2d at 425. Finding it to be an appropriate situation to look behind the corporate entity, the Court precluded the plaintiff corporation from bringing an action that its shareholders could not maintain in their own right. The Court rejected the public interest considerations relied on by the Court of Appeals, finding that the antitrust and securities laws did not contemplate the windfall recovery that plain-

---

**29.** The same conclusion was recently reached by Chief Judge Jones of the District Court of the District of Columbia in an antitrust action brought by REA against its former railroad shareholders. *See REA Express, Inc. v. Travelers Ins. Co.,* 406 F.Supp. 1389 (D.D.C., filed February 2, 1976).

tiff sought for the benefit of its shareholders.

■ *Bangor Punta* clearly requires us to grant defendants' summary judgment motion as to plaintiff's pre-divestiture claims. For almost 40 years after its creation, REA was wholly owned by the defendant railroads. The current shareholder, REA Holding Corp., acquired its 99% interest in REA from the defendants and from various entities and individuals [30] who acquired their interest directly or indirectly from the alleged wrongdoers.[31] To the extent that the defendants' treatment of REA resulted in injury to it, the damage was in substance suffered by the defendants themselves. Any damage done to REA would have been reflected in a reduction in the value of the REA stock held by the defendants. Plaintiff's current shareholders would have benefited from any such reduction in value when they made their purchase of stock. They cannot now make a claim based on the fact that what they purchased "as is" for a bargained for price could have been more valuable if it had been treated better in the past. Additionally, recovery now on these substantial antitrust claims would have the ironic effect of requiring the defendants to pay three times over for injuries that they inflicted upon themselves. Accordingly, *Bangor Punta* controls our disposition of the pre-divestiture claims.

30. We address at p. 1255 *infra* the impact of the fact that some of REA Holding Corp.'s transferors received their stock prior to August 20, 1969, the end of the pre-divestiture period.

31. While, in form, some of the stock was received by REA Holding Corp.'s transferors from the plaintiff rather than from the defendants, the substance of such a transfer is the same as if each of the shareholders of REA at the time transferred an equal proportion of its stock to the new shareholder. Therefore, in substance, the issuance of treasury stock by a corporation, an action which dilutes the interest of the then current shareholders, is a transfer *from the then current shareholders to the* new shareholders.

32. Indeed, $345 million is a very modest indication of the scope of plaintiff's damage claims. In interrogatory answers, plaintiff has asserted that $110 million in damages before trebling were accrued in a three-year period alone and that as a result of only one of the range of

The windfall to plaintiff's shareholders in this case if the recovery sought for the pre-divestiture period were awarded would be astonishingly greater than that which the Court found unacceptable in *Bangor Punta*. In that case, the plaintiff sought $7 million, or $2 million in excess of the purchase price paid by its new shareholders for their stock. Here, REA Holding Corp. paid the defendants approximately $2 million for their stock, and yet plaintiff now asserts a damage claim of at least $115 million based on the alleged antitrust violations, most of which is said to have arisen during the pre-divestiture period, and $20 million based on the alleged breach of fiduciary duty. Merely considering the former claim alone plaintiff's shareholders who paid $2 million for the stock of plaintiff could recover $345 million [32] ($115 million trebled), a windfall which would make *Bangor Punta* pale into insignificance by comparison.

■ Furthermore, we find that Delaware law controls the disposition of the breach of fiduciary claim [33] and that Delaware courts *would apply the equitable principles of Bangor Punta* in finding that plaintiff could not recover on that claim.[34]

Plaintiff attempts to avoid the impact of *Bangor Punta* by noting several factual distinctions between this case and *Bangor Punta*. We nonetheless are convinced that

grievances asserted here. Considering that plaintiff claims damages for a total of forty years (and asserts that the statute of limitations is no bar because it was dominated by the railroads, *see* note 45 *supra* ), the full potential for recovery may be many times $345 million.

33. Applying Pennsylvania conflicts of laws principles, *see Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we find that because REA is a Delaware corporation, Delaware law controls as to the nature of fiduciary obligations owed to it. *See Hirshhorn v. Mine Safety Appliances Co.,* 106 F.Supp. 594, 600 (W.D.Pa.1952), *aff'd,* 203 F.2d 279 (3d Cir.), *cert. denied,* 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (1953).

34. *See Goodman v. Futrovsky,* 42 Del.Ch. 468, 213 A.2d 899, 903 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1197, 16 L.Ed.2d 209 (1966).

the full precedential weight of that case is binding upon us as far as plaintiff's pre-divestiture claims are concerned.[35] REA first argues that the *Bangor Punta* rule should not apply where a horizontal price fixing conspiracy or other conspiracy engaged in by shareholder-suppliers to restrain trade in violation of § 1 of the Sherman Act is alleged. Conduct in violation of § 1 should not, plaintiff argues, be immunized by the fact that some of the conspirators were shareholders. *Bangor Punta* is said to be distinguishable because it involved claims of alleged mismanagement, misappropriation, violations of § 10 of the Clayton Act and § 10(b) of the Securities Exchange Act by a single shareholder, not a Sherman Act § 1 violation involving more than one participant. Plaintiff refers to Clayton Act § 10 as a "prophylactic rule," implying that it is of less significance in terms of antitrust policy than Sherman Act § 1.

The two distinctions that plaintiff points to, namely that a different, more important statutory provision is involved here and that a group rather than an individual is charged with illegal conduct, do not alter the ultimate effect of allowing recovery on pre-divestiture claims, for: (1) plaintiff's new shareholders would still receive a substantial windfall as a fortuitous result of having purchased stock in a corporation at a fair market price; and (2) plaintiff's new shareholder (the Holding Corp.) and its shareholders have not been damaged by the allegedly violative conduct. Section 1 of the Sherman Act, to borrow a phrase from the Supreme Court, does not "contemplate recovery by [plaintiff] in these circumstances." 417 U.S. at 716; 94 S.Ct. at 2586, 41 L.Ed.2d at 429.

Moreover, the rationale of the Court in *Bangor Punta* is not tied as closely to the nature of the cause of action then before the court as plaintiff would have us find. The Court stated as the basis for its decision that it would not, because of overriding equitable principles, countenance a windfall recovery. Changing the statutory context out of which a windfall recovery arises does not change the fact that it is a windfall. We also note that the important public policies embodied in Sherman Act § 1 are not left totally unprotected by our conclusion in this regard. The holding that damages cannot be collected by an allegedly injured corporation from its former owners under these circumstances does not prevent the government from bringing suit at any time to protect the public against adverse effects of the parents' behavior toward their subsidiary. As noted above, the government actually did at one point bring an antitrust action against REA, which was dismissed on immunity grounds.[36] The *Bangor Punta* rule does not approve of the conduct alleged or grant a full antitrust immunity or exemption. It merely prevents the use of a particular remedy in certain contexts.

Plaintiff's next counterargument is that the *Bangor Punta* Court recognized an exception to the *Home Fire* equitable principle "where the effects of the wrongful acts continued and resulted in injury to the present shareholders." 417 U.S. at 711 n. 6; 94 S.Ct. at 2583 n. 6, 41 L.Ed.2d at 426. It is not at all clear that the Court recognized and approved such an exception in *Bangor Punta*. The Court merely alludes to a statement by Dean Pound in *Home Fire* respecting post-divestiture injuries and states that the plaintiff does not allege a post-divestiture effect so that the Court does not have to reach the question of whether there is such an exception. We note preliminarily that even if there were such an exception, it could not save the bulk of plaintiff's pre-divestiture claims. The putative exception would allow a corporation to recover for post-divestiture damages which are proximately caused by pre-divestiture conduct. The continuation of the alleged wrong or its consequences into the post-divestiture period does not, however, entitle the wronged corporation to damages for the pre-divestiture period. Furthermore, we believe that, under the circumstances of this case, there is no exception

---

**35.** None of plaintiff's arguments attack the applicability of *Bangor Punta* to Count II.

**36.** *See* p. 1247 *supra.*

for post-divestiture damages which are proximately caused by the pre-divestiture conduct. Even if the plaintiff were restrained by agreements which it entered into while it was dominated by the railroads, its new owners, who were REA's pre-divestiture management team, were aware of its condition and, in making their decision to invest in the plaintiff, must be deemed to have taken the fact that the plaintiff had entered into disadvantageous agreements into account. In fact, in this case, if there were such agreements the purchasers could have required the sellers to cancel the disadvantageous agreements as a condition of the sale. The situation might be different in a case where there were allegations of fraud on the part of the sellers, but no such allegations were made by the plaintiff in this case.

Plaintiff next attempts to dilute the effect of *Bangor Punta* by arguing that *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), which held that the doctrine of *in pari delicto* is not available as a defense to an antitrust action, prevents the application of *Bangor Punta* to a Sherman Act § 1 claim. Plaintiff would, in other words, have us broaden the *Perma Life* rule to cover equitable defenses other than *in pari delicto* in Section 1 cases. In *Perma Life,* the plaintiffs, who were Midas muffler franchisees, claimed that Midas' standard dealer sales agreement into which each of them had entered contained price fixing provisions, territorial restrictions, and tying arrangements which were illegal restraints of trade. The Court found that the plaintiffs were not estopped from bringing a private treble damages action by the fact that they were parties to the allegedly illegal contracts or indeed that they had benefited from them. We find that *Perma Life* does not help plaintiff for several reasons. First, we now have the later ruling of the Supreme Court in *Bangor Punta,* a case in which the relevant facts are extremely close to the ones before us, whereas those in *Perma Life* are far different. Significantly, the majority of the Court in *Bangor Punta* which also involved antitrust claims did not find it necessary to distinguish *Perma Life,* even though the *Perma Life* argument is relied upon in the dissenting opinion in *Bangor Punta.* 417 U.S. at 731; 94 S.Ct. at 2593, 41 L.Ed.2d at 437. This fact strongly reinforces our view that *Perma Life* has no application to this case.

Second, *Perma Life* did not involve a parent-subsidiary relationship where the "damage" suffered by the subsidiary is essentially only a matter of internal accounting. The plaintiffs and defendants there were only related through their contractual arrangements, not through stock holdings. The plaintiffs in *Perma Life* could have suffered injury which was not in effect simply part of an internal transaction, since they were separate entities in both form and substance. Third, the holding in *Perma Life* is narrowly stated, only precluding reliance on the *in pari delicto* defense, and the opinion cannot be read to eliminate the effect of all equitable principles or defenses in antitrust actions.

Plaintiff's final counterargument to *Bangor Punta* is that, because of certain events occurring as early as 1959 involving efforts by the defendants to divest themselves of their REA stock, the end of the pre-divestiture period to which *Bangor Punta* applies is indefinite, and that the holding of *Bangor Punta* is therefore inapplicable to this case. In support of this contention, plaintiff asserts that the defendants decided to divest themselves of their REA stock in 1959, and at about the same time, began to take steps which would hamper the ability of REA to compete freely and bargain with them once they relinquished control of it. Plaintiff adverts in this regard to the defendant's contract to sell 20% of REA to Greyhound in 1964, and the fact that this contract was not terminated until 1967. However, plaintiff does not effectively articulate a theory which explains why these events affect the applicability of *Bangor Punta* during the post-1959 period. Despite all of these occurrences, the defendants and their co-con-

spirators remained sole owners of plaintiff through 1968 and the dominant owners until August 1969. Any recovery for damages alleged to have occurred during this period would still amount to a windfall. We find the actual ownership of stock and the windfall effect to be the determinative factors in *Bangor Punta,* and their presence here despite the events pointed out by plaintiff requires us to apply the holding of that case with full force and effect.

Plaintiff points out that approximately 576,000 REA shares were issued to non-defendants in 1968, giving them approximately 20% ownership of plaintiff. Plaintiff argues that because one-fifth of its stock was held by non-defendants during this period, *Bangor Punta* should not preclude an award for damages incurred after the time of the issuance of this stock. However, in *Bangor Punta* itself, the Court noted that minority shareholders held about 1% of the BAR shares, but denied recovery nonetheless. In a footnote the Court recognized that a *pro rata* recovery on behalf of the minority shareholders might be fashioned in certain circumstances, but did not reach the question whether it was appropriate in that case because the plaintiffs "disavowed any intent to obtain a pro-rata recovery  . .." 417 U.S. at 718 n. 15; 94 S.Ct. at 2587 n. 15, 41 L.Ed.2d at 430. Similarly, in this case, plaintiff points to the minority interest as a means of completely avoiding *Bangor Punta,* not as a ground for *pro rata* relief. Therefore, we also need not reach the question of how to shape a remedy to protect "minority shareholders" [37] through *pro rata* recovery under these circumstances, even if

there were a substantive basis (and see n. 37) to justify such protection.[38] We also note that our decision to grant summary judgment for defendants on Count I is based on several alternative grounds which have been relied on by other courts to deny recovery even where there were substantial minority interests.[39]

## 2. Does Plaintiff State an Antitrust Cause of Action in Count I?

■ The second basis on which the defendants assert their entitlement to summary judgment on Count I is analogous to the *Bangor Punta* rationale: that a corporation fails to state an antitrust claim when it alleges that all of its former shareholders engaged in a conspiracy in restraint of trade which resulted in damage to the corporation. As in the case of the *Bangor Punta* theory, it is difficult to understand in terms of stating an antitrust claim how a wholly owned corporation is damaged in anything other than a formalistic or internal accounting sense by such a conspiracy of its shareholders. Allowing a damage recovery would simply result in a wash transaction. We agree with defendants that plaintiff has failed to establish an antitrust claim.[40]

■ The necessary predicate of plaintiff's antitrust claim, under the circumstances of this case, must be that a subsidiary, although conceived and wholly owned by companies for a particular purpose, nonetheless must be operated with full economic independence of its parents. Plain-

---

**37.** *Quaere* whether the minority shareholders for the transitional period under discussion qualify as minority shareholders in the conventional sense, a proposition open to serious question.

**38.** Defendants have answered plaintiff's point by arguing that we should not impose such a limitation on *Bangor Punta* because the present real party in interest is REA Holding Corp., which was not a REA shareholder until August 1969. The defendants' position seems to exalt form over substance in an area of the law where courts have been reluctant to do so, since the intermediate non-defendant share-

holders exchanged their REA shares for REA Holding Corp. shares and therefore continued to be the real parties in interest.

**39.** See Parts III.A.2.,B, *infra.* It should also be noted that there were no minority shareholders at the time when the acts alleged in Count II to be breaches of fiduciary duty occurred, and therefore no pro rata recovery would be possible on the Count II claim.

**40.** In so holding, we do not preclude the possibility of an antitrust action by the government or by a third party under these circumstances.

tiff contends that the shareholders must compete with each other in their dealings with the subsidiary and must allow their subsidiary both to compete against them and to deal freely with their competitors under pain of antitrust scrutiny. However, the law is plain that a wholly-owned subsidiary has no right to economic independence of all its parents acting unanimously and that no antitrust claims may be founded upon the absence of such independence.

The conduct here complained of was joint conduct engaged in by all of plaintiff's former shareholders in the use of their voting powers in plaintiff or in the contractual arrangements they made with it.[41] The defendants were permitted by the ICC to establish plaintiff as their joint agency. When a number of enterprises combine together for the purpose of creating or acquiring a joint facility—such as railroads establishing a terminal company, or small enterprises combining to support a joint research facility or small merchandisers combining together to promote a common trademark or a common buying facility—no suggestion has ever been made that the jointly-owned facility is required to bite the hand that feeds it, as it were, or that it is not to be completely controlled by its parents, acting jointly.[42] Whether that joint control is exercised through votes on the board of the joint enterprise or through uniform operating agreements designed to establish the basis of the relationships of the parents to the subsidiary is of little moment. The wholly-owned joint entity is not an independent competitive enterprise which can be required to ignore the collective desires of all of its parents.[43]

Plaintiff garrisons its theory of the case by citations to a series of intra-enterprise cases for the proposition that "[t]he corporate interrelationships of the conspirators . . . [are] not determinative of the applicability of the Sherman Act." *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010, 2018 (1947). All but one of the cases cited, however, were suits in which a third party (either the United States or a private party) alleged a conspiracy among members of a corporate family.[44] The other case cited by the plaintiff, *Rogers v. American Can Co.,*

**41.** Plaintiff claims for the first time in its brief that there may actually have been several conspiracies, each involving less than all the shareholder-defendants. Plaintiff did not, however, make such allegations in its complaint, and we therefore do not consider them here. Plaintiff additionally attempts to counter defendants' "no antitrust cause of action" argument by maintaining that the level of participation of each defendant in the conspiracy was different. Even if plaintiff's allegations are true, our application of the principles being discussed to this case is unaffected.

**42.** The United States Supreme Court has acknowledged that a parent will not compete with its subsidiary. *Cf. United States v. Penn-Olin Co.,* 378 U.S. 158, 169, 84 S.Ct. 1710, 1716, 12 L.Ed.2d 775, 784 (1964); *United States v. Columbia Steel Co.,* 334 U.S. 495, 523, 68 S.Ct. 1107, 1122, 92 L.Ed. 1533, 1551 (1948). Several Justice Department officials have also made statements to the effect that internal arrangements between members of a corporate family would not be challenged by the Department's antitrust division. *See* D. Baker, The "Affiliation" Problem in Banking 14 (1972); Letter from R. W. McLaren to the Federal Reserve Board, CCH Trade Reg.Rep. ¶ 50,122 (1971); An Interview with the Honorable Donald F. Turner, 34 Antitrust, L.J. 113, 122–23 (1967); Turner, Address before the American Bar Association, 10 Antitrust Bull. 685, 687 (1965).

**43.** The inclusion among the defendants of certain short-line railroads that were not shareholders of the plaintiff does not change our conclusion. The basic disability against suit by the wholly-owned subsidiary—namely that there is no expectation of independent "trade" which is counter to the wishes of all its shareholders—remains the same whether or not the shareholders also collaborated with others.

**44.** The cases cited are *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Schenley Distillers Corp. v. United States,* 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946); and *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir. 1971).

187 F.Supp. 532 (D.N.J.1960) *aff'd,* 305 F.2d 297 (3d Cir. 1962), is also factually distinguishable. In that case Rogers brought a derivative action on behalf of M & T Co. against some of its directors and American Can Co., a 20% shareholder. The court therefore did not approve an action by a corporation against all of its shareholders.

On the other hand, Chief Judge Lord recently expressed the view that a subsidiary cannot state an antitrust claim against its parent. See *In re Penn Central Securities Litigation,* 367 F.Supp. 1158 (E.D.Pa. 1973). In that case, the minority shareholders of a company which was 80% owned by Penn Central alleged in a derivative action that Penn Central had conspired with others to allocate markets and functions among three companies which Penn Central controlled, including the plaintiff's. Judge Lord concluded that the challenged allocation of territories among Penn Central's controlled companies "was merely internal management of a single business enterprise . . .;" "[a]ll that we have here is a decision by a parent as to the conduct of its subsidiaries' businesses, which is not a § 1 violation." *Id.* at 1166, 1167. *Cf. International Rys. v. United Fruit Co.,* 373 F.2d 408, 416 n. 12, *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967); *Bluefield S. S. Co. v. United Fruit Co.,* 243 F. 1 (3d Cir. 1917), *writ of error dismissed by stipulation,* 248 U.S. 595, 39 S.Ct. 136, 63 L.Ed. 438 (1919).[45] We agree.

**45.** Even if we had found that plaintiff stated an antitrust cause of action, plaintiff's claim for damages based on antitrust violations occurring prior to April 3, 1967, is also barred by the four year statute of limitation of the Clayton Act. Clayton Act § 4B, 15 U.S.C., § 15b (1970). Plaintiff claims that the statute of limitations was tolled during the period of railroad ownership basing this assertion on the doctrine of domination. *See Saylor v. Lindsley,* 302 F.Supp. 1174, 1184 (S.D.N.Y.1969). We believe, however, that no purpose would be served by applying the domination doctrine in a context, such as this, in which there are no minority interests to be protected against the actions of the controlling individuals or entities. Cf. *Bluefields S. S. Co. v. United Fruit Co.,* 243 F. 1 (3d Cir. 1917), *writ of error dismissed by stipulation,* 248 U.S. 595, 39 S.Ct. 136, 63 L.Ed. 438 (1919).

### 3. Unanimous Shareholder Approval of the Conduct Alleged in Count II

Plaintiff alleges in Count II of the complaint that the defendants induced REA's directors to breach their fiduciary obligations by causing REA to purchase certain refrigerator cars in 1955 and 1957. Defendants do not dispute that the directors did, at various times in 1954 and 1955, unanimously adopt resolutions authorizing REA's officers to make specified purchases of refrigerator cars at specified prices, or that purchases were made in accordance with those resolutions in 1955 and 1957. Each of the Board resolutions was set forth in the minutes of the Board meeting, and each such resolution was, at the subsequent annual shareholders meeting, unanimously approved by all the REA stockholders. We agree with defendants both that we must apply Delaware law in deciding this question[46] and that, as a matter of Delaware law, directors of a corporation do not breach their fiduciary duty to the corporation by taking action which, as admitted by plaintiff, was taken at the behest of all the shareholders of the corporation.[47] Delaware courts have required parent corporations to be fair in their dealings with their subsidiaries "insofar as those dealings affect the interests of minority shareholders of the subsidiary." *Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883, 886 (Del.1970). But in the absence of minority shareholders, it is impossible to discern the breach of duty involved in responding to the wishes of all shareholders.[48] If, as is

**46.** See note 32 *supra.*

**47.** *See, e. g., Goodman v. Futrovsky,* 42 Del.Ch. 468, 213 A.2d 899, 902 (Del.1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1197, 16 L.Ed.2d 209 (1966); *Brainard v. De La Montanya,* 18 Cal.2d 502, 116 P.2d 66, 70 (1941); *Seymour v. Spring Forest Cemetery Ass'n,* 144 N.Y. 333, 39 N.E. 365 (1895); *Tompkins v. Sperry, Jones & Co.,* 96 Md. 560, 54 A. 254, 258 (1903).

**48.** *See also Saxe v. Brady,* 40 Del.Ch. 474, 184 A.2d 602, 605 (Ch.1962) ("the well-settled rule [is] that a waste of corporate assets is incapable of ratification without unanimous stockholder consent"); *Bailey v. Jacobs,* 325 Pa. 187, 189 A. 320, 327 (1937); *Goldberg v. Berry,* 231 App.Div. 165, 247 N.Y.S. 69, 74 (1930).

conceded, the shareholders ordered REA's directors to make acquisitions that were in the interest of the defendants, the shareholders were not thereby breaching their legal obligations, and the REA directors, being "bound by legal and moral obligations to manage the business of the corporation in the interest of all the stockholders," *Hechelman v. Geyer,* 248 Pa. 430, 431, 94 A. 188 (1915), were entirely justified in following their shareholders' instructions.

Even assuming that the board actions in 1954 and 1955 constituted a breach of fiduciary obligations by REA's directors, the subsequent ratification of those actions by unanimous shareholder vote precludes plaintiff's present challenge. The curative power of shareholder ratification is limited only where that ratification is not unanimous. "[I]t is established that Delaware stockholders *absent a unanimous vote* may not ratify fraud and in effect make a gift of corporate assets." *Putterman v. Daveler,* 36 Del.Ch. 508, 134 A.2d 480, 484 (1957) (emphasis added). According to a New York court:

> It is axiomatic that a minority cannot be allowed to be injured without their acquiescence by fraud or other misconduct resulting in personal profit to officers, directors or others, even if such defalcation is approved by the majority, but it is otherwise if it is approved by all of the shareholders.

*Capitol Wine & Spirit Corp. v. Pokrass,* 277 App.Div. 184, 98 N.Y.S.2d 291, 295 (1950), *aff'd,* 302 N.Y. 734, 98 N.E.2d 704 (1951).[49] Similarly, in *Field v. Lew,* 184 F.Supp. 23 (E.D.N.Y.1960), *aff'd sub nom., Field v. Bankers Trust Co.,* 296 F.2d 109 (2d Cir.

1961), *cert. denied,* 369 U.S. 859, 82 S.Ct. 948, 8 L.Ed.2d 17 (1962), the court commented on a bankruptcy trustee's claim for conversion against the corporation's sole shareholder:

> [T]he general rule of liability does not apply when the officer's acts have been ratified by all the shareholders of the corporation. In that case, the unauthorized acts of the individual become the authorized acts of the corporation [and], the corporation loses its right of action against the officer . . . .

184 F.Supp. at 27. Accord, *Cunningham v. Jaffe,* 251 F.Supp. 143, 148–49 (D.S.C.1966); *General Hatters Supply Co. v. Hartman,* 148 N.Y.S.2d 90 (S.Ct., N.Y.Co., 1955).

In sum, the directors' actions in responding to all shareholders cannot constitute a fiduciary breach, and the subsequent unanimous ratification cures any possible fiduciary breach. For these reasons, as well as those discussed in Part III.A.1. of this opinion, summary judgment in favor of defendants must be granted as to Count II.[50]

### B. Antitrust Immunity

Reverting to Count I, defendants argue in support of their motion for summary judgment on the pre-divestiture aspects of plaintiff's antitrust claims that their relationship with REA is immunized against antitrust attack by § 5(11) of the Interstate Commerce Act, 49 U.S.C. § 5(11) (1970), by virtue of the ICC's approval of railroad control of REA in its § 5(2) order of 1929 and subsequent § 5(1) orders approving the pooling provisions of the SEOA's. Section 5(11) reads in pertinent part:

---

**49.** *Distinguishing Continental Securities Co. v. Belmont,* 206 N.Y. 7, 99 N.E. 138 (1912), where the defendant unsuccessfully pleaded majority ratification as a defense.

**50.** The Supreme Court has employed unanimous shareholder assent to bar a corporation from asserting a defense. *Hotel Co. v. Wade,* 97 U.S. 13, 24 L.Ed. 917 (1877), was a state-law action to foreclose a mortgage in which the defendant corporation defended on the ground that the obligation upon which the mortgage was based was void, having been issued to

insiders in breach of their trust relationship to the corporation. Relying on the trial court's finding that the transactions were sanctioned by all the shareholders (although only a majority formally voted approval), the Supreme Court affirmed the judgment for plaintiff:

> Transactions of the kind have often occurred; and it has never been held that the arrangement was invalid, where it appeared that the stockholders were *properly consulted,* and sanctioned what was done, either by their votes or silence.

97 U.S. at 23, 24 L.Ed. at 919.

[A]ny carriers or other corporations, . . . participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws . . . insofar as may be necessary to enable them to carry into effect the transaction so approved . . . .

Defendants rely on the specific approvals mentioned above and assert that any other conduct alleged by the plaintiff to have violated the antitrust laws is immunized because it was "necessary to carry into effect" the specific approvals. Defendants cite *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (*"Toolco"*) for this reading of the "necessary to carry into effect" language.[51] We agree that the practices and actions challenged in Count I of the complaint are covered by the § 5(11) antitrust immunity.

Defendants' position requires us to construe the language of § 5(11) to determine whether it provides defendants with the broad immunity they claim. No case construing § 5(11)'s umbrella clause has been cited to us, and we have been unable to locate on our own any case interpreting that provision. We do, however, find guidance in determining the scope of the provision in *Toolco,* in which the Supreme Court was faced, among other things, with construing § 414 of the Federal Aviation Act, 49 U.S.C. § 1384 (1970) the parallel antitrust immunity provision of that Act.

*Toolco* was an antitrust action brought by TWA against its former controlling shareholder. Hughes Tool acquired its TWA stock in a series of transactions, first purchasing in excess of 40% of the outstanding stock in the early 1940's. The CAB approved this acquisition in 1944 as well as additional purchases of shares in 1948 under § 408 of the Federal Aviation Act, 49 U.S.C. § 1378 (1970), a provision comparable to the acquisition-of-control provision of § 5(2) of the Interstate Commerce Act. By 1950, Hughes Tool had acquired an 80% equitable interest in TWA.[52] The CAB determined that a new approval order under § 408 was thus necessary, for an 80% control position by Hughes Tool would "obviously impl[y]

---

**51.** In addition to claiming statutory immunity, defendants make a strong argument that the I.C.C. orders, approvals, and general jurisdiction over the REA-railroad relationship pre-empt the application of the antitrust laws to that relationship, relying again on *Toolco.* Because of our holding on the question of statutory immunity as well as the other grounds argued by the defendants, we do not believe it necessary to reach the significant questions presented by this argument. We note, however, that while we agree with the defendants that there are substantial factual similarities between the case *sub judice* and *Toolco,* there is also a significant difference. The Supreme Court's pre-emption determination is heavily grounded on the provisions of the Federal Aviation Act which require the CAB to consider the antitrust implications of its orders. We have not found, and defendants have not cited to us, provisions of the Interstate Commerce Act which require the I.C.C. to make the same kind of antitrust-based analysis prior to acting. *Cf. In re Midwest Milk Monopolization Litigation,* 380 F.Supp. 880, 884 (W.D.Mo.1974); *In re Mutual Fund Sales Antitrust Litigation,* 374 F.Supp. 95, 110 (D.D.C.1973); *Macom Products Corp. v. American Telephone & Telegraph Co.,* 359 F.Supp. 973 (C.D.Cal.1973). Section 408(b) of the Federal Aviation Act which au-

thorized the CAB to approve mergers and acquisitions of control prohibits such approval if it "would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier." Section 102 requires that the Agency, in assessing public interest, consider "competition to the extent necessary to assure the sound development of an air-transportation system . . . ." Relying on these and other similar statutory provisions, the Court in *Toolco* concluded:

> Competition and monopoly—two ingredients of the antitrust laws—are thus standards governing the [CAB]. . . . *In this context,* the authority of the Board to grant the power to "control" and to investigate and alter the manner in which that "control" is exercised leads us to conclude that this phrase of CAB jurisdiction, . . . pre-empts the antitrust field.

409 U.S. at 385, 93 S.Ct. at 659, 34 L.Ed.2d at 592. [emphasis added]

**52.** In 1947, Hughes Tool agreed to loan $10,-000,000 to TWA in return for interest bearing notes convertible into common stock. When all the notes were converted, Hughes Tool held an 80% interest in TWA. 409 U.S. at 371, 372, 93 S.Ct. at 653, 34 L.Ed.2d at 584.

power to dictate the complete corporate activities of the corporation," 409 U.S. at 372, 93 S.Ct. at 653, 34 L.Ed.2d at 585, and such an approval was issued.

After Hughes Tool surrendered its control of TWA in 1960, TWA filed an antitrust suit with the complaint resting principally on Hughes Tool's conduct as controlling stockholder during the years 1955–1960. *Id.* at 377, 93 S.Ct. at 656, 34 L.Ed.2d at 587. Five transactions involving the sale and lease of airplanes were the focus of TWA's claims. Each of these transactions had been specifically approved by the CAB under its § 408 authority. Based on the series of CAB approvals beginning in 1944, the Supreme Court ruled that the statutory immunity accorded by § 414,[53] covered not only Hughes Tool's "ownership of TWA stock" but also the "contemplated actual and legal control of TWA" by Hughes Tool. 409 U.S. at 386, 93 S.Ct. at 660, 34 L.Ed.2d at 593. The proceedings approving the stock acquisition:

> made it as plain as possible that Toolco's stock ownership would inevitably result in Toolco's exercising authority over the day-to-day affairs of TWA, including the acquisition and financing of equipment. It was precisely this kind of control the Board approved.

*Id.* The Board "fully realized" Hughes Tool would make acquisition decisions for TWA, and "[i]t was precisely this type of association that it contemplated when it approved the additional control" in 1950. *Id.* at 387, 93 S.Ct. at 660, 34 L.Ed.2d at 593.[54]

Important parallels between *Toolco* and the case before us are evident. In each the appropriate regulatory agency approved as "in the public interest" acquisitions of stock

control of such a magnitude as to "obviously impl[y] power to dictate the complete corporate activities" of the acquired company. 409 U.S. at 372, 93 S.Ct. at 653, 34 L.Ed.2d at 585. Under both regulatory statutes, the approval accorded antitrust immunity to the affected parties. 49 U.S.C. §§ 5(11), 1384. In each instance the agency was informed that the parent or parents would in fact exercise their control. In *Toolco*, the parent acquired its control in a series of transactions, so that by the time of its 1950 order the Board had a track record upon which future conduct could be predicted. In REA's case, the railroads in 1929 made detailed representations to the Commission about how they intended to deal with the acquired entity: numerous collective decisions would be made; the railroads would elect the board of directors; restraints on REA's activities would be imposed; the entity was to serve the railroads' interests.

Here, as in *Toolco*, the control relationship was subject to continued regulatory supervision. Section 415 of the Federal Aviation Act, 49 U.S.C. § 1385 (1970), gives the Board statutory authority to inquire into any control relationship. The ICC is similarly empowered, either on complaint or its own initiative, to investigate control relationships subject to its jurisdiction and to issue supplemental orders as it deems proper to govern or condition that relationship. 49 U.S.C. §§ 5(9), 13(2) (1970).[55] In both instances this supervisory power was exercised. The CAB approved a number of aircraft acquisitions by TWA from Hughes Tool. The ICC approved the Southern Railway's addition in 1938 to the control group, approved the presence of each of the new railroad directors on the REA Board, reviewed the REA-railroads relationship in

---

53. The language of § 414 is similar to that of Interstate Commerce Act § 5(11). Section 414 reads in relevant part:

> Any person affected by any order made under . . . this title shall be, and is hereby, relieved from the operations of "the antitrust laws", . . . insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order.

54. The Court also relied in its holding on the pre-emption ground discussed in note 51 *supra.*

55. In addition, the Commission has authority to inspect all "accounts, books, records, memoranda, correspondence and other documents, of any person controlling, controlled by, or under common control" with a common carrier. 49 U.S.C. § 20(5) (1970).

periodic express rate proceedings, analyzed competitive aspects of the relationships as a result of the Justice Department's antitrust suit, and approved various recapitalizations of REA stock and other financial transactions.

Such factual differences as may exist between *Toolco* and the present case make this a more appropriate one for antitrust preemption and comprehensive immunity. First, the control in REA's instance was total rather than 80%, thus implying all the more clearly that the controlled entity existed to serve the interests of its owners. Second, REA was a newly formed entity, designed for the specific purpose of serving as the railroads' agency, unlike TWA, which was previously an independent and publicly held corporation. Third, the controlling parties in REA's case were themselves common carriers whose functions were pervasively regulated by the Commission, whereas TWA's owner was merely a *supplier* of common carriers and thus only indirectly subject to the Board's jurisdiction.

Plaintiff's various pre-divestiture claims in effect amount to a repeated contention that REA was not to be treated as an agency of the railroads and had to be regarded as an independent competitive entity. Thus the complaint focuses on collective action by the railroads as to the terms for their furnishing transportation services to REA, collective action on the charges they imposed on REA for use of their facilities and equipment, and collective action to limit REA in its use of non-rail modes and in its competition with the railroads. The refrigerator car purchases are asserted to be an antitrust violation on the theory that they limited REA's ability to compete with the railroads and tied REA to the rail mode of transportation. However, as in *Toolco,* the foregoing type of conduct was contemplated by the ICC when it approved railroad ownership and control of REA.

Clearly, if the agency involved were the CAB, and the statute the Federal Aviation Act, *Toolco* would dictate a finding of complete immunity. The remaining question is whether, because of the differences in statutory language between FAA § 414 and ICA § 5(11), or differences in the context in which the agencies act, § 5(11) should be read more narrowly than § 414. Arguably the language of § 414—"to do anything authorized, approved or required"—is broader than that of § 5(11)—"to enable them to carry into effect the transaction"— but the Supreme Court's holding in *Toolco* is not bottomed upon a literal reading of the particular statutory language. The Court relies primarily on what the agency contemplated or must have contemplated and expected in approving the transaction. The transaction approved therefore becomes not just the paper transfer of shares but also the after effects of that transfer which were considered by the agency. The grant of immunity also must cover these proximate consequences of the approval. Any other reading of the statute would make the immunity provision almost meaningless, protecting the approved relationship in its nascent stages but leaving it open to attack shortly thereafter. We therefore do not find the differences in the language of the statutes significant.

■ The Supreme Court in *Toolco* does indeed rely heavily on the particular standards regarding monopoly and competition provided the CAB in the Federal Aviation Act in making its preemption determination,[56] and certainly the Court's construction of § 414 may have been influenced by these standards. Other than the vague public interest language, we do not find these standards to be expressly stated in the Interstate Commerce Act. However, Congress, in § 5(11), has plainly provided antitrust immunity for common carrier combination approved by the ICC after it has made the public interest determinations required by the Act. The differences in the statutory standards guiding agency action therefore do not affect either our determination as to the precedential value of *Toolco* or our own independent construction of § 5(11). Also, as noted above, a narrow

**56.** *See* note 51 *supra.*

construction of this grant of immunity would render Congress' efforts meaningless, and this we shall not do. Based on our own construction of ICA § 5(11), we therefore find that the challenged conduct of the former owners of 100% of REA's stock is immunized from antitrust attack. In addition to the broad immunity which we find to be conferred by the § 5(2) order of 1929, and to the extent that plaintiff attacks the jointly determined charges imposed upon plaintiff for rail transportation services, we rely on the immunity provided by the § 5(1) approvals of the SEOA's [57] in reaching this determination.

We have enunciated our views on the immunity question without explicit reference to the plaintiff's views thereon. We address plaintiff's contentions now. Plaintiff makes two basic arguments against defendants' claim of immunity. Plaintiff

first claims that *Toolco* must be narrowly read because the CAB in that case specifically approved the aircraft sale and lease transactions which were the primary basis of TWA's claims. While we agree with plaintiff's description of the *Toolco* factual situation, we do not believe that the Supreme Court relied heavily on these approvals in reaching its holding on § 414 immunity. In discussing the scope of § 414 (409 U.S. at 386, 387, 93 S.Ct. at 660, 34 L.Ed.2d at 593), the Court stressed the effect of the 1950 order approving 80% control of TWA by Hughes Tool and only mentioned the later modifications of the order approving the individual sale and lease transactions incidentally. The Court nowhere stated or implied that its holding would have been different if the CAB had not limited its 1950 order so as to require the later approvals.[58]

---

57. We disagree, however, with two other contentions of the defendants regarding statutory immunity. First, defendants claim that the refrigerator purchases attacked by the plaintiff are immune because, in approving the financing of the purchases, the ICC said that they were *necessary* for REA to perform its services as an express carrier. Because of the finding of necessity, defendants argue that § 5(11) immunity arises. We do not, however, believe that any transaction necessary for REA to perform its services is *a fortiori* necessary to carry out, is authorized by, or implied in the § 5(2) order of 1929, the purpose of which was to approve railroad control of REA. We find the purchase to be immunized directly by the § 5(2) order, not because of the ICC approval of the financing arrangement.

The defendants' second contention is that CAB approval of the Air Express Agreements entered into between REA and air carriers immunizes the railroad-shareholders against antitrust liability. The immunity grant of FAA § 414 is limited, however, to "persons affected by [the] order" which we find does not extend immunity to the shareholders of the "immunized" person. We do, however, find that the railroad-defendants' actions with respect to these agreements are immunized by § 5(11) of the ICA.

58. Plaintiff cites several cases in support of its argument distinguishing *Toolco*, none of which are helpful. In *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1975), the court rejected the defendants' argument that *Toolco* extends to a situation

where there was no CAB order related to the predatory practices alleged. Clearly, in our situation, the ICC has made a number of significant orders related to the REA-railroad relationship. In *Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767 (2d Cir. 1972) *cert. denied*, 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973), the court found, among other things, that the defendants were not air carriers within the CAB jurisdiction. Additionally, the agreement in question had not been submitted to the CAB for approval. Similarly, *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), cited by the Court in *Toolco*, 409 U.S. at 387, 95 S.Ct. at 660, 34 L.Ed.2d at 593, and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) did not involve agency approved associations of corporate entities. In *Mt. Hood States, Inc. v. Greyhound Corp.*, 1973–2 CCH Trades Cases ¶ 74,824 (D.Ore.1973), the court rejected the defendant's claim of immunity based on related approvals where the ICC had explicitly disapproved the specific conduct sought to be immunized. The court's reading of *Toolco*, if anything, supports our resolution of the immunity question. It concluded from *Toolco* that

> [w]hen an agency, with the authority to immunize transactions from the operation of the antitrust laws, necessarily considers the public interest and approves conduct explicitly before the agency as part of a proposed transaction, such conduct is thereby made immune from antitrust liability.

74,824 at 95,670.

Plaintiff's second basic argument is that the § 5(2) order of 1929 did not approve the manner in which the defendants would relate to REA as suppliers as opposed to shareholders. As indicated above, we believe that this aspect of the REA-railroad relationship was contemplated by the ICC and therefore comes under the cloak of immunity. Plaintiff would have us believe that it came as a surprise to the ICC that the railroad-shareholders would supply services to REA or that, in doing so, the railroads would not treat their two personalities—supplier and shareholder—independently. Clearly, this is not the case.

Two other points raised by plaintiff are simply disposed of. Plaintiff contends that by returning to the ICC for approval of the SEOA's in 1954 and 1959, defendants impliedly admitted that the 1929 order did not provide extensive antitrust immunity. Defendants, however, correctly point out that the Act requires them to apply to the Commission for approval of pooling arrangements. Thus, it would have been a violation of the Act if Commission approval had not been sought. Finally, plaintiff notes that the ICC only approved the pooling provision of the SEOA's, not all of their terms. However, in view of our finding with respect to the immunity provided by the § 5(2) order of 1929, this limitation on the § 5(1) order could not in any event affect our decision.

IV. *Summary and Conclusion*

■ It is apparent that plaintiff cannot now claim that it is entitled to damages based on conduct of the defendants that occurred during the time that the defendants were in control of the plaintiff. Defendants' motion for summary judgment must therefore be granted as to that part of

Count I claiming damages based on conduct which occurred prior to August 20, 1969, the date on which defendants transferred their stock in plaintiff, and as to Count II in its entirety. We have based our conclusions on several grounds. Our decision on Count I has been founded upon the *Bangor Punta-Home Fire* equitable principle, upon the doctrine that a subsidiary cannot state an antitrust claim based on conduct of all of its parents, and upon statutory immunity. Our Count II determination has been based on the *Bangor Punta-Home Fire* rationale, and unanimous shareholder ratification and authorization.[59] We reserve decision on the part of the motion for summary judgment relating to damages arising after August 20, 1969. An early conference will be held at which we will outline the considerations which have delayed our decision on the post-divestiture portion of the case. Counsel will thereafter have an opportunity to supplement the record or to further explicate their positions on the difficult and novel issues involved.

In consideration of the foregoing opinion, we enter the following orders for partial summary judgment in favor of all railroads on that part of Count I claiming damages based on conduct which occurred prior to August 20, 1969, and on Count II in its entirety.

APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REA Express, Inc. and REA Express [Canada], Ltd. v. Aberdeen & Rockfish Railroad Co., et al. Civil Action No. 71–802.

---

**59.** The claims made in Count II are also barred by the relevant statute of limitations. We do not have to decide which state's statute applies, since we are required by Pennsylvania law to apply the Pennsylvania statute if the statute which Pennsylvania's borrowing statute would otherwise require us to apply were more favorable to the plaintiff than the analogous Pennsylvania statute. *See Prince v. Trustees of Univ. of Pa.*, 282 F.Supp. 832, 839 (E.D.Pa.

1968). The analogous Pennsylvania statute is 12 Pa.Stat. § 41 which contains a six year limitation period. Since the last purchase of refrigerator cars was made in 1957 and the action was not brought until 1971, it is clearly barred. As we have stated above, *see* note 45 *supra*, we do not find the doctrine of domination to be helpful to plaintiff under the circumstances of this case.

REA Express, Inc. and REA Express [Canada], Ltd. v. Central Vermont Railway Co. Civil Action No. 73–27.

REA Express, Inc. and REA Express [Canada], Ltd. v. Lake Superior & Ishpemming Railroad Co. Civil Action No. 73–40.

REA Express, Inc. and REA Express [Canada], Ltd. v. Illinois Terminal Railroad Co. Civil Action No. 73–41.

REA Express, Inc. and REA Express [Canada], Ltd. v. Green Bay & Western Railroad Co. Civil Action No. 73–85.

REA Express, Inc. and REA Express [Canada], Ltd. v. Duluth, Winnipeg & Pacific Railway Co. Civil Action No. 73–86.

REA Express, Inc. and REA Express [Canada], Ltd. v. Maine Central Railroad Co. Civil Action No. 73–87.

REA Express, Inc. and REA Express [Canada], Ltd. v. Atlanta & West Point Railroad Co., et al. Civil Action No. 73–94.

Seaboard Coastline Railroad Co. v. REA Express, Inc. Civil Action No. 73–120.

REA Express, Inc. and REA Express [Canada], Ltd. v. Camas Prairie Railroad Co. et al. Civil Action No. 73–121.

St. Louis Southwestern Railway Lines v. REA Express, Inc. Civil Action No. 73–272.

REA Express, Inc. and REA Express [Canada], Ltd. v. Bangor & Aroostook Railroad. Civil Action No. 73–326.

Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. REA Express, Inc. Civil Action No. 75–330.